UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CHANMONY HUOT, VLADIMIR SALDAÑA, CHAMPA PANG, LIANNA KUSHI, THOEUN KONG, DENISSE COLLAZO, SUE J. KIM, SOADY OUCH, TOOCH VAN, CARMEN BERMUDEZ, KEI KAWASHIMA-GINSBERG, DANIEL K. UK, AND FAHMINA ZAMAN,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF LOWELL, MASSACHUSETTS; KEVIN J. MURPHY, in his official Capacity as Lowell City Manager; LOWELL CITY COUNCIL; RITA M. MERCIER, RODNEY M. ELLIOTT, EDWARD J. KENNEDY, JR., JOHN J. LEAHY, WILLIAM SAMARAS, JAMES L. MILINAZZO, DANIEL P. ROURKE, COREY A. BELANGER, JAMES D. LEARY, in their official capacities as Members of the Lowell City Council; LOWELL SCHOOL COMMITTEE; STEPHEN J. GENDRON, JACQUELINE DOHERTY, CONNIE A. MARTIN, ROBERT J. HOEY, JR., ROBERT JAMES GIGNAC, ANDRE DESCOTEAUX, in Their official capacities as members of the Lowell School Committee; LOWELL ELECTION AND CENSUS COMMISSION; and BEVERLY ANTHES, JOSEPH MULLEN, THEL SAR, THOMAS FR. O'BRIEN, in their official Capacities as members of the Lowell Election and Census Commission,<br><br>Defendants, | C.A.17-CV-10895-FDS |

-1-

# DEFENDANTS' MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFFS' COMPLAINT

## I. INTRODUCTION

Now come the Defendants ("Defendants" or "City") in the above-captioned action and request that this Honorable Court dismiss the Plaintiffs' Complaint in its entirety pursuant to Fed.R.Civ.P. 12(b)(6). As grounds therefor, and as explained more fully below, the Complaint fails to state a claim upon which relief may be granted because Plaintiffs do not allege facts plausibly suggesting that they can prove a violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301. In particular, Plaintiffs do not and cannot allege facts plausibly suggesting that under an (unspecified) alternative voting procedure in Lowell there is a sufficiently large and geographically compact district that would be majority-minority.

## II. FACTS

Plaintiffs allege the following facts, several of which are contested by the City but which, for the purposes of a motion to dismiss, are assumed to be true.[1]

Minorities constitute more than 49% of Lowell's total population. Lowell's Asian-American and Hispanic/Latino communities *by themselves* constitute nearly 40% of the city's total population. The city is currently divided into eleven separate wards, with each ward encompassing three precincts. The City is also divided into three state representative districts,

---

[1] Plaintiffs allege several other facts in their Complaint that are presumably intended to add color to the "totality of the circumstances" they claim is indicative of vote suppression. The City does not recite those facts here. While it does not deny that "totality of circumstances" would be the ultimate measure of an alleged Voting Rights Act violation, there are nonetheless necessary criteria a plaintiff must be able to demonstrate to state a claim under Section 2, and the Plaintiffs' complaint does not plausibly suggest that they could meet such a standard. Defendants thus do not ask the Court to consider Plaintiffs totality of the circumstances argument at the pleading stage.

which do not map precisely onto the eleven wards.[2] All Lowell City Council and Lowell School Committee candidates are elected in an at-large, city-wide, plurality voting system. *See* G.L. c. 43 § 93 ("Plan E – Government by a City Council Including a Mayor Elected From Its Number, and a City Manager, With All Elective Bodies Elected At Large by Proportional Representation.") At the polls, Lowell voters may vote for up to nine total City Council candidates and six total School Committee candidates. Candidates who overall receive among the top nine and top six votes are elected to the Lowell City Council and Lowell School Committee, respectively. Lowell's nine-member City Council is currently all-white, as is its six-member School Committee.[3] In the last five elections, only two City Council seats and no School Committee seats were won by Asian-American or Hispanic/Latino candidates.

Plaintiffs allege that the Census Bureau 2011-2015 survey provides the following results:

(a) <u>non-Latino whites</u> constitute approximately 50.7% of Lowell's total population, 55.7% of its voting age population, and 61.0% of its citizen voting age population;

(b) <u>Asians</u> constitute approximately 21.8% of Lowell's total population, 21.0% of its voting age population, and 17.0% of its citizen voting age population;

(c) <u>Hispanics/Latinos</u> constitute approximately 18.1% of Lowell's total population, 15.4% of its voting age population, and 15.5% of its citizen voting age population;   and

(d) <u>blacks/African Americans</u> constitute approximately 7.1% of Lowell's total population, 6.7% of its voting age population, and 5.3% of its citizen voting age population.

Plaintiffs claim that Lowell's Hispanic/Latino and Asian-American residents together are "sufficiently numerous and geographically compact to form a majority of the total population,

---

[2] This fact is not alleged by Plaintiffs; the Court may nonetheless take judicial notice of the City's voting divisions.

[3] The City is a Plan E form of government, and per statute the Mayor is a member of both the City Council and the School Committee. *See* Mass. Gen. Laws ch. 43 §§ 31, 97.

voting age population, and citizen voting age population in at least one district of a reasonable and properly-apportioned district-based election system." Plaintiffs do not identify the district according to existing ward or district boundaries, nor do they explain how it would be constructed other than to claim that "a district comprising [unidentified] portions of the Acre, Lower Highlands, and/or Highlands neighborhoods of Lowell can be drawn that satisfies this precondition."

Plaintiffs further allege that Hispanic/Latino and Asian Americans consistently tend to vote together in support of minority candidates of choice, particularly Asian-American and Hispanic/Latino candidates. They claim that "[a]nalysis of [2013] election results indicates that [two Cambodian-American candidates] were heavily supported by Asian-American and Hispanic/Latino voters but neither . . . won a seat on the Lowell City Council." One of the candidates had previously won a City Council seat in the 2011 election. Plaintiffs claim that these in the 2015 elections for council two Cambodian-American were also "heavily supported by both Asian-American and Hispanic/Latino voters," but were not elected. They further allege that two Cambodian-American candidates ran for the School Committee in 2015 and enjoyed "strong support" from both Asian-Americans and Hispanic/Latino voters, but were not elected. Plaintiffs generally allege that Lowell's city-wide at-large election system enables a predominantly white majority voting "bloc" to deny Asian-Americans and Hispanics/Latinos the equal opportunity to elect representatives of their choice. Plaintiffs do not allege any other specific support for their claim that whites form a "bloc" vote.

### III. STANDARD OF REVIEW

Even though a complaint need not plead "detailed factual allegations," it must nonetheless "contain sufficient factual matter, accepted as true, to state a claim to relief that is

plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The complaint must include "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. While material allegations of a complaint are taken as true for purposes of a motion to dismiss, unsupported conclusions of fact, unwarranted inferences, and sweeping legal conclusions are not. *See Maldonado v. Fontanes*, 568 F.3d 263, 268 (1st Cir. 2009) (mere conclusory statements are "not entitled to the assumption of truth"), citing *Twombly*, 550 U.S. at 555.

Two underlying principles must guide the court's assessment as to the adequacy of the pleadings to support a claim for relief. *Id*. The Court's first step is to "isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements." *Schatz v. Republican State Leadership Comm*, 669 F.3d 50, 55 (1st Cir. 2012); *see also Twombly*, 550 U.S. at 555. "Threadbare recitals of the elements of a cause of action," unsupported by facts, and merely buttressed by conclusory statements, are "not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 678-79; *Maldonado* 568 F. 3d. at 268. The second step is to "take the complaint's well-pled (i.e., non-conclusory, non-speculative) facts as true, drawing all reasonable inferences in the pleader's favor, and see if they plausibly narrate a claim for relief." *Schatz*, 669 F.3d at 55. "Plausible, of course, means something more than merely possible, and gauging a pleaded situation's plausibility is a 'context-specific' job that compels [the Court] 'to draw on' [its] 'judicial experience and common sense.'" *Schatz*, 669 F.3d at 12, citing *Iqbal*, 556 U.S. at 679.

In sum, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the Complaint has alleged – but it has not 'show[n]' – that the pleader

is entitled to relief." *Iqbal*, 556 U.S. at 679. As discussed below, the Complaint fails to set forth any set of facts entitling Plaintiffs to any relief in law or in equity. Accordingly, the Court should dismiss the Complaint pursuant to Rule 12(b)(6).

## IV. <u>ARGUMENT</u>

Alleged violations of Section 2 of the Voting Rights Act are assessed under the framework set forth in the seminal case of *Thornburg v. Gingles*, 478 U.S. 30 (1986). In *Gingles*, the Supreme Court held that Section 2 of the Voting Rights Act is not violated unless the minority group can first prove the following three things: "[f]irst, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district;" second, it must be "politically cohesive;" and third, the white majority must vote sufficiently as a bloc so as to defeat the group's preferred candidate. *Gingles*, 478 U.S. 30 at 48-50. While such criteria are not pleading standards *per se*, they are "necessary but not sufficient to establish a claim." *Metts v. Murphy*, 363 F.3d 8, 10 (1st Cir. 2004), citing *Johnson v. De Grandy*, 512 U.S. 997, 1011, (1994). Therefore, to withstand a 12(b)(6) motion to dismiss, a plaintiff must plead facts plausibly suggesting that he or she can meet the *Gingles* factors. Plaintiffs do not do so here.

1. **<u>Plaintiffs do Not Plead a Sufficiently Large and Geographically Compact District in Which They Would Constitute a Voting Majority.</u>**

Plaintiffs have not pled facts plausibly suggesting that they can meet the first *Gingles* factor. In order to establish the first factor Plaintiffs would they need to demonstrate that there is a "sufficiently large and geographically compact" majority-minority district in which they might plausibly represent that minority. It follows from this that Plaintiffs must at least state what district they are talking about (whether it is currently a voting district or whether Plaintiffs ultimately propose redrawing lines so that it becomes a voting district), and plead facts plausibly

suggesting that such a district would be majority-minority. Despite many conclusory claims that it is "possible" to draw such a district, Plaintiffs have not actually identified it. The only non-conclusory factual allegation they make regarding such a district is that "a district comprising portions of the Acre, Lower Highlands, and/or Highlands neighborhoods of Lowell can be drawn [in which Asian-Americans and Hispanics/Latinos would form a majority of the population]." The City submits that this pleading is insufficient for Plaintiffs to state a claim under *Gingles*. *See*, *e.g.*, *Rodriguez v. Pataki*, 308 F. Supp. 2d 346, 382 n.41 (S.D.N.Y. 2004) (showing that compact minority district could exist is a prerequisite for injury);

    First, Plaintiffs do not actually define their proposed district. All the complaint alleges is that unspecified "portions" of City neighborhoods would comprise a majority-minority district. But Plaintiffs are not permitted to carve whatever boundaries they like in order to state a voting dilution claim under *Gingles*, as otherwise the first factor would have no teeth. *See Shaw* v. *Hunt*, 861 F. Supp. 408, 485 (E.D.N.C. 1994) (since a district conceivably could *always* be drawn to incorporate enough minority voters to constitute a majority in a single-member district, no matter how otherwise dispersed, allowing such would effectively read the 'geographical compactness' requirement out of the Court's Section 2 jurisprudence altogether). Indeed, since Plaintiffs do not state what the boundaries of their envisaged "portions" of City neighborhoods are, it would ultimately be impossible to assess Plaintiffs' claims. *See*, *e.g.*, *Montes v. City of Yakima*, 40 F. Supp. 3d 1377, 1391-92 (E.D. Wa. 2014) ("The compactness inquiry under § 2 . . . focuses more generally on whether the proposed minority district reasonably comports with 'traditional districting principles' such as contiguousness, population equality, maintaining communities of interest, respecting traditional boundaries, and providing protection to incumbents").

Despite the fact that Plaintiffs allege (correctly) that Lowell is "divided into eleven separate wards, with each ward encompassing three precincts," they do not identify which of those wards and/or precincts (or which parts thereof) comprise the "portions" of Lowell they would combine. A prerequisite to satisfying the first *Gingles* factor, even at the pleading stage, must be actually to propose a district. Plaintiffs have not done so here. See *Broward Citizens for Fair Dists v. Broward County*, 2012 U.S. Dist. LEXIS 46828, at *18 n.6 (S.D. Fla. Apr. 3, 2012) ("Plaintiffs' mere allegation that '[s]everal alternate maps were presented to the County Commission which would potentially achieve the objectives of the County's redistricting mandate without violating the constitutional rights of the Black and other minority voting population' is conclusory and insufficient to meet Plaintiffs' pleading burden"); *Iqbal*, 556 U.S. at 678-79 ("Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions").[4]

Second, even assuming *arguendo* that Plaintiffs had identified their proposed district (which they have not), Plaintiffs do not provide any non-conclusory facts plausibly suggesting that their proposed district would in fact be in fact majority-minority. The complaint includes allegations containing statistics about the Lowell population at large but, notably, no statistics are supplied, nor any other factual allegations presented, regarding the population of Plaintiffs' proposed district. Instead, Plaintiffs ask the court to assume on faith that it simply "would be" majority-minority. The City submits that this also is insufficient to state a claim. Courts have dismissed Section 2 cases on the pleadings where plaintiffs have failed to plead that the

---

[4] Defendants do not contend that Plaintiffs must necessarily produce a delineated map of their proposed district at the pleading stage. Nonetheless, they must state something more than that "portions" of neighborhoods could comprise an appropriate district.

complainant minority group comprises a majority of the proposed district. *See, e.g., Hall v. Virginia*, 385 F.3d 421, 431 (4th Cir. 2004) (affirming dismissal of section 2 claim where minority did not plead that they would be a majority in proposed district); *NAACP v. Snyder*, 879 F. Supp. 2d 662, 671 (E.D. Mich. 2012). Here, Plaintiffs do not provide such information beyond a conclusory statement that they "would form" a majority in their unspecified proposed district. This merely recites the *Gingles* element with no additional (even minimal) substantiation, and does not state a claim.

In short, Plaintiffs should not be permitted to proceed based only upon vague and conclusory pleadings that an unspecified prospective district "would be" majority-minority (at least when Asian-Americans and Hispanics/Latinos are combined) when they have presented no factual basis for such claims.

### 2. **Plaintiffs Should Not be Permitted to Proceed on a Aggregate-Minority Claim**

Plaintiffs claim that an aggregate of two racial groups, Hispanic/Latino and Asian-American, is sufficiently large to form a majority in a single-member district (yet to be proposed). At no point in their complaint do they allege that a single minority is sufficiently large to form a majority in a single-member district – indeed, based even on the at-large numbers they present, they cannot claim this. However, because the Voting Rights Act does not provide protection to coalitions, Plaintiffs' claim must fail.[5]

---

[5] The Supreme Court of the United States has not addressed whether an aggregate of racial groups can bring a §2 claim under the Voting Rights Act. As discussed below, the 6th Circuit *en banc* held that an aggregate of minorities is not permitted to bring a section 2 claim as it is not supported by the statute either textually or conceptually and would impermissibly require courts to form race based assumptions. *See Nixon v. Kent County*, 76 F.3d 1381 (6th Cir. 1996) (*en banc*); *see also Hall*, 385 F.3d at 431. Prior to the *en banc* decision in *Kent County* the fifth circuit and eleventh circuit had held that an aggregate of minorities that meets all of the *Gingles* factors may bring suit. *See, Campos v. City of Baytown*, 840 F.2d 1240 (5th Cir. 1988); *Concerned Citizens of Hardee County v. Hardee County Bd. Of Comm'rs*, 906 F.2d 524 (11th Cir. 1990). As there is not consensus among the circuits and the First Circuit has not expressed

Recognizing a Section 2 claim in this circumstance would essentially grant minority voters a right to preserve their strength for the purposes of forging an advantageous political alliance. But nothing in Section 2 grants special protection to a minority group's right to form political coalitions. *See Hall*, 385 F.3d at 431. The Voting Rights Act "is a balm for racial minorities, not political ones – even though the two often coincide." *Id.*, quoting *Baird v. Consol. City of Indianapolis*, 976 F.2d 357, 361 (7th Cir. 1992).

### a. *No Textual Support for Aggregation*

"The plain meaning of legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intention of its drafters.'" *Fahey v. Mass. Dep't of Revenue (In re Fahey)*, 779 F.3d 1, 9 (1st Cir. 2015), quoting *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242 (1989). The plain text of the Voting Rights Act by its express terms does not contemplate an aggregation of racial groups as being entitled to Section 2 protection. It does not mention coalition groups; instead, it consistently uses the singular indefinite article, "a," to reference "**a** class of citizens protected by subsection (a)," and "members of **a** protected class." *See* 52 U.S.C.S. § 10301(b).[6] As the Sixth Circuit *en banc* has put it:

---

an opinion, the City respectfully contends that the more recent reasoning of *Nixon* is persuasive, and that this court should follow that lead. In *Campos*, the Fifth Circuit found merely that coalition was "not prohibited" by the statute. *Kent County* rejected that reasoning and incorporated the *Campos* dissenting opinion of Judge Higginbotham in its reasoning: "the proper question is whether Congress intended to protect those coalitions. A statutory claim cannot find its support in the absence of prohibitions. . . . Thus, even if the panel had attempted to support its fiat with inferences of intent gleaned from the statute, it would not have been proper to do so. . ." *Kent County*, 76 F.3d at 1388, *quoting City of Baytown*, 849 F.2d at 944-45 (Higginbotham, J., dissenting). *En banc* decision offer greater precedential value than decisions of circuit courts.

[6] This section formerly appeared as 42 USCS § 1973.

> If Congress had intended to sanction coalition suits, the statute would read 'participation by members of *the classes* of citizens protected by subsection (a)' or more simply, 'participation by citizens protected by subsection (a).' Moreover, the central element necessary to establish a violation is a showing that '*its* members have less opportunity than other members of the electorate . . . ," [52 U.S.C.S. § 10301(b) (emphasis added), not that '*their* members have less opportunity.' Finally, Congress declared in subsection (b) that 'the extent to which members of *a protected class* have been elected' is one circumstance which may be considered. *Id.* (emphasis added). As in prior instances, if Congress had intended to authorize coalition suits, the phrase would more naturally read: 'the extent to which members of the *protected classes* have been elected.'

*Nixon v. Kent County*, 76 F.3d 1381, 1386-1387 (6th Cir. 1996); *see also League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 894 (5th Cir. 1993) ("According to customary legal analysis, there should be no need to discuss the minority coalition theory of vote dilution because the text of the Voting Rights Act does not support it.") (Jones, J., concurring).

The Sixth Circuit further concluded (while also noting that it did not need to reach such analysis due to the plain reading of the statute) that coalition of minority cases was not contemplated by the legislature. *See Kent County*, 76 F.3d at 1287 (citing committee reports from amendments to the VRA in 1975 and 1982 and noting that no report contains any "reference, implicit or explicit to the issue of aggregation"). It remains the case since *Kent County* was decided that the legislative history of Section 2 contains no mention or implication of coalition minority groups.[7]

### b. *Section 2 is Not Intended to Protect Political Alliances*

Section 2 of the Voting Rights Act was enacted "to help effectuate the Fifteenth Amendment's guarantee that no citizen's right to vote shall 'be denied or abridged . . . on account of race, color, or previous condition of servitude." *Voinovich v. Quilter*, 507 U.S. 146,

---

[7] *Gingles*, which is currently the leading judicial authority on implementation of the Voting Rights Act, also does not contemplate coalition. Indeed, *Gingles* expressly notes that in some cases a minority will not be sufficiently numerous and geographically compact to state a Voting Rights Act claim. *See Gingles*, 478 U.S. at 50-51. If coalition were allowed, this possibility would become far more remote.

152 (1993), quoting U.S. Const. amend. XV, § 1. To interpret Section 2 as protecting coalition groups would deviate from this legislative intent of Section 2 because it would instead provide protection to political alliances. *See Hall v. Virginia*, 385 F.3d 421, 431 (4th Cir. 2004) ("any construction of Section 2 that authorizes the vote dilution claims of multiracial coalitions would transform the Voting Rights Act from a law that removes disadvantages based on race, into one that creates advantages for political coalitions that are not so defined.") While it may often be advantageous for minority groups to forge coalitions, this is not the sort of voter dilution that Section 2 was intended to protect. *Id.* (Voting Rights Act "a balm for racial minorities, not political ones"), quoting *Baird v. Consol. City of Indianapolis*, 976 F.2d 357, 361 (1992).

The First Circuit has not carved out a position on the issue of aggregation of minority groups under Section 2, but in other contexts has implied that aggregation is not permissible for reasons similar to those proffered in *Hall*. *See Latino Political Action Comm. v. Boston*, 784 F.2d 409 (1st Cir. 1986). In *Boston*, several non-profits and registered voters claimed that minority voting power was diluted by the City's redistricting plan which both packed some minorities into districts of almost exclusively minority population and diluted minority power by spreading minority votes thinly elsewhere. The circuit court affirmed the district court's finding that the city's redistricting plan was legally permissible. The First Circuit (like the district court) did not consider the claim of the minority groups in the aggregate and instead analyzed the claims of each racial group alone. *See id. at* 415. In analyzing the packing allegation of Black voters into Districts 4 and 7, the court contemplated adding Hispanic and Asian voters to the percent of minorities "packed" into the districts (*id.* at 414) and stated that voters of different ethnic groups may differ on "particular important issues in an election – for example, the value of bilingual education in a school election." The court rejected the appellant's argument that Districts 4 and 7

were packed with minorities (of various ethnic subgroups) and instead analyzed whether Blacks alone were packed in those districts. Accordingly, the First Circuit has suggested that coalitions of minorities are not entitled to Section 2 protection because they are inherently not a cohesive unit but are instead at best a political coalition.

## V.  CONCLUSION

WHEREFORE, the Defendants respectfully request that this Honorable Court dismiss the Plaintiffs' Complaint pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted.

September 15, 2017                          CITY OF LOWELL, ET AL., DEFENDANTS

/s Christine P. O'Connor
Christine P. O'Connor, City Solicitor
BBO # 567645
Lee M. Holland, Assistant City Solicitor
BBO # 650617
James F. Wellock, Assistant City Solicitor
BBO #686926
City of Lowell Law Department
375 Merrimack Street, 3rd Floor
Lowell, MA 01852-5909
Tel: 978-674-4050
Fax: 978-453-1510
CO'Connor@lowellma.gov
LHolland@lowellma.gov
JWellock@lowellma.gov

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing document was filed through the Electronic Case Filing System for filing and electronic service to the registered participants as identified on the Notice of Electronic Filing on September 15, 2017.

/s Lee M. Holland
Lee M. Holland, Assistant City Solicitor