**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| CHANMONY HUOT, VLADIMIR SALDAÑA, CHAMPA PANG, LIANNA KUSHI, THOEUN KONG, DENISSE COLLAZO, SUE J. KIM, SOADY OUCH, TOOCH VAN, CARMEN BERMUDEZ, KEI KAWASHIMA-GINSBERG, DANIEL K. UK, and FAHMINA ZAMAN, | ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) **Case No. 1:17-cv-10895-WGY** ) |
| CITY OF LOWELL, MASSACHUSETTS; KEVIN J. MURPHY, in his official capacity as Lowell City Manager; LOWELL CITY COUNCIL; RITA M. MERCIER, RODNEY M. ELLIOTT, EDWARD J. KENNEDY, JR., JOHN J. LEAHY, WILLIAM SAMARAS, JAMES L. MILINAZZO, DANIEL P. ROURKE, COREY A. BELANGER, JAMES D. LEARY, in their official capacities as members of the Lowell City Council; LOWELL SCHOOL COMMITTEE; STEPHEN J. GENDRON, JACQUELINE DOHERTY, CONNIE A. MARTIN, ROBERT J. HOEY, JR., ROBERT JAMES GIGNAC, ANDRE DESCOTEAUX, in their official capacities as members of the Lowell School Committee; LOWELL ELECTION AND CENSUS COMMISSION; and BEVERLY ANTHES, JOSEPH MULLEN, THEL SAR, THOMAS FR. O'BRIEN, in their official capacities as members of the Lowell Election and Census Commission, | ) **JURY TRIAL DEMANDED** ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

# Table of Contents

**Page**

I.      Background ................................................................................................................ 3

II.     Legal Standard ......................................................................................................... 5

III.    Plaintiffs Plausibly Allege a District Satisfying the Numerousness and
        Compactness Requirement ..................................................................................... 6

        A.      Plaintiffs Plausibly Allege that an Asian-American and Hispanic/Latino
                Majority-Minority District Could Be Created in Lowell ........................................ 6

        B.      Defendants Seek to Impose an Incorrect Evidentiary Burden by
                Requiring Plaintiffs to Define a Majority-Minority District at the
                Pleading Stage ..................................................................................................... 8

        C.      Defendants' Legal Authority Is Inapposite and Does Not Support
                Dismissal of Plaintiffs' Complaint ...................................................................... 10

IV.     Minority Coalition Claims Are Cognizable Under Section 2 ........................................... 13

        A.      Section 2's Plain Language Supports Minority Coalition Claims ........................ 13

        B.      The Majority of Circuit Courts that Have Addressed the Issue Permit
                Section 2 Minority Coalition Claims ................................................................... 16

        C.      Decisions in the First Circuit Suggest that Section 2 Minority Coalition
                Claims Are Cognizable ...................................................................................... 18

V.      Conclusion ............................................................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Badillo v. City of Stockton, California,*
    956 F.2d 884 (9th Cir. 1992) ...........................................................................16, 17

*Bank of America Corp. v. City of Miami, Florida,*
    137 S. Ct. 1296 (2017).............................................................................................16

*Bartlett v. Strickland,*
    556 U.S. 1 (2009)....................................................................................................18

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007)....................................................................................5, 6, 8, 9

*Black Political Task Force v. Galvin,*
    300 F. Supp. 2d 291 (D. Mass. 2004) .........................................................6, 19, 20

*Brewer v. Ham,*
    876 F.2d 448 (5th Cir. 1989) ..................................................................................17

*Bridgeport Coalition for Fair Representation v. City of Bridgeport,*
    26 F.3d 271 (2d Cir. 1994), *vacated on other grounds* 512 U.S. 1283 (1994)............17, 18, 20

*Broward Citizens for Fair Districts v. Broward County,*
    No. 12-cv-60317, 2012 WL 1110053 (S.D. Fla. Apr. 3, 2012)........................11, 12

*Campos v. City of Baytown, Texas,*
    840 F.2d 1240 (5th Cir. 1988) ...........................................................................16, 17

*Cia. Petrolera Caribe, Inc. v. Arco Caribbean, Inc.,*
    754 F.2d 404 (1st Cir. 1985)...................................................................................13

*Committee for a Fair & Balanced Map v. Illinois Board of Elections,*
    No. 11-cv-05065, 2011 WL 5185567 (N.D. Ill. Nov. 1, 2011) .......................7, 9, 13

*Concerned Citizens of Hardee County v. Hardee County Board of Commissioners,*
    906 F.2d 524 (11th Cir. 1990) ................................................................................17

*General Motors Corp. v. Darling's,*
    444 F.3d 98 (1st Cir. 2008).................................................................................13, 15

*Georgia State Conference of NAACP v. Gwinnett County Board of Registrations & Elections,*
    No. 16-cv-02852, 2017 WL 4250535 (N.D. Ga. May 12, 2017).............................17

*Growe v. Emison*,
  507 U.S. 25 (1993)............................................................................................16

*Hall v. Louisiana*,
  974 F. Supp. 2d 978 (M.D. La. 2013)..............................................................7, 13

*Hall v. Virginia*,
  385 F.3d 421 (4th Cir. 2004) .....................................................................9, 11, 18

*Hogar Agua y Vida en el Desierto, Inc. v. Suarez-Medina*,
  36 F.3d 177 (1st Cir. 1994)...................................................................................6

*Johnson v. Hamrick*,
  155 F. Supp. 2d 1355 (N.D. Ga. 2001), *aff'd*, 296 F.3d 1065 (11th Cir. 2002) .....................17

*Keyes v. School District No. 1*,
  413 U.S. 189 (1973)............................................................................................16

*Langlois v. Abington Housing Authority*,
  207 F.3d 43 (1st Cir. 2000)................................................................................16

*Latino Political Action Committee, Inc. v. City of Boston*,
  784 F.2d 409 (1st Cir. 1986)........................................................................18, 19

*LULAC v. Clements*,
  999 F.2d 831 (5th Cir. 1993) ............................................................................17

*LULAC v. Midland Independent School District*,
  812 F.2d 1494 (5th Cir.), *vacated on state law grounds*, 829 F.2d 546 (5th Cir. 1987) .........16

*Luna v. County of Kern*,
  No. 16-cv-00568, 2016 WL 4679723 (E.D. Cal. Sept. 6, 2016) .................................... *passim*

*Metts v. Murphy*,
  363 F.3d 8 (1st Cir. 2004).........................................................................5, 6, 9, 20

*Montes v. City of Yakima*,
  40 F. Supp. 3d 1377 (E.D. Wash. 2014) ............................................................10

*NAACP v. Snyder*,
  879 F. Supp. 2d 662 (E.D. Mich. 2012)...........................................................9, 11

*Nixon v. Kent County*,
  76 F.3d 1381 (6th Cir. 1996) ............................................................................18

*Overton v. Austin*,
  871 F.2d 529 (5th Cir. 1989) ............................................................................17

*Perez v. Abbott*,
 No. 11-cv-00360, 2017 WL 1450121 (W.D. Tex. Apr. 20, 2017) .........................................17

*Pope v. County of Albany*,
 No. 11-cv-00736, 2014 WL 316703 (N.D.N.Y. Jan. 28, 2014) .............................................18

*Riggs v. Curran*,
 863 F.3d 6 (1st Cir. 2017) ................................................................................................3, 5

*Rodriguez v. Pataki*,
 308 F. Supp. 2d 346 (S.D.N.Y. 2004) .............................................................................10, 18

*Romero v. City of Pomona*,
 883 F.2d 1418 (9th Cir. 1989), *abrogated on other grounds by*
 *Townsend v. Holman Consulting Corp.*, 914 F.2d 1136 (9th Cir. 1990) ...............................17

*Shaw v. Hunt*,
 861 F. Supp. 408 (E.D.N.C. 1994), *rev'd* 517 U.S. 899 (1996) .......................................10, 11

*Shaw v. Hunt*,
 517 U.S. 899 (1996) ...........................................................................................................11

*Shelby County, Alabama v. Holder*,
 133 S. Ct. 2612 (2013) ........................................................................................................15

*Thornburg v. Gingles*,
 478 U.S. 30 (1986) ...................................................................................................... *passim*

*Veasey v. Abbott*,
 830 F.3d 216 (5th Cir. 2016) .........................................................................................15, 16

*Wright v. Rockefeller*,
 376 U.S. 52 (1964) ..............................................................................................................15

## Statutes

52 U.S.C. § 10301 ...................................................................................................... *passim*

## Other Authorities

Federal Rule of Civil Procedure 12(b)(6) ...........................................................................5, 9

S. Rep. No. 94-295 (1975), *reprinted in* 1975 U.S.C.C.A.N. 774 .............................................15

S. Rep. No. 97-417 (1982), *reprinted in* 1982 U.S.C.C.A.N. 177 .............................................15

As described in the Complaint (ECF No. 1), the City of Lowell, Massachusetts, has elected all nine members of its City Council and all six members of its School Committee over many decades through an at-large plurality voting system where all candidates are elected on the basis of a city-wide vote.  Despite Asian-Americans and Hispanics/Latinos comprising approximately 40% of Lowell's total population, and despite the fact that Asian-Americans and Hispanics/Latinos vote together cohesively in support of similar candidates, the City Council and the School Committee are comprised entirely of white members, elected by Lowell's predominantly white majority voting bloc, as they have been for virtually all of Lowell's history. The result—as could be expected—is that the City's provision of services and responsiveness to the concerns of residents have been inconsistent and unequally distributed.

Plaintiffs allege that the City's at-large election system denies Asian-Americans and Hispanics/Latinos an equal opportunity to elect candidates of their choice, a right safeguarded by the Fourteenth and Fifteenth Amendments to the United States Constitution and by Section 2 of the Voting Rights Act, 52 U.S.C. § 10301 ("Section 2").  The Complaint sets forth factual allegations sufficient to establish the three threshold *Gingles* preconditions necessary for this case to proceed, namely: (1) that Lowell's combined Asian-American and Hispanic/Latino community is sufficiently large and geographically compact to constitute a majority in a single-member district; (2) that Asian-Americans and Hispanics/Latinos in Lowell are politically cohesive in their voting patterns; and (3) that the predominantly white majority in Lowell votes sufficiently as a bloc to enable it, in the absence of special circumstances, usually to defeat Asian-American and Hispanic/Latino preferred candidates.  *See Thornburg v. Gingles*, 478 U.S. 30, 50-51 (1986).

Defendants' Motion to Dismiss Plaintiffs' Complaint (ECF No. 17) (the "Motion") chiefly argues that Plaintiffs have failed to adequately plead the first of the three *Gingles* preconditions regarding the size and compactness of Lowell's Asian-American and Hispanic/Latino population. But the Motion ignores Plaintiffs' factual allegations that Asian-Americans and Hispanics/Latinos are sufficiently large (40% of the Lowell's population) and geographically compact (highly concentrated in several contiguous neighborhoods) to constitute a majority in at least one district for both the nine-member City Council and the six-member School Committee. Plaintiffs have more than satisfied their pleading obligations.[1]

As a fallback, Defendants also contend that a group of voters comprised of members of more than one race—*i.e.*, a minority coalition—cannot jointly assert a Section 2 claim. However, the plain language of the statue confirms that minority coalition claims are cognizable. The strained reading of Section 2 suggested by Defendants would frustrate the statute's broad remedial purpose of protecting minority group voters from discriminatory voting practices at the hands of the majority. It also runs counter to the weight of decisions in other circuits, four of which have ruled that coalition claims are cognizable, with just one reaching a different conclusion.

Plaintiffs have more than met their burden to plead facts setting out an actionable claim for relief under Section 2 that is plausible on its face. Accordingly, Defendants' Motion should be denied.[2]

---

[1] As described below in Part I, the Complaint contains other facts plausibly alleging that the second and third *Gingles* preconditions are satisfied. Defendants do not contend otherwise.

[2] Defendants' Motion only seeks dismissal of Plaintiffs' Section 2 claims, and does not seek or express any basis for dismissal of Plaintiffs' causes of action under the Fourteenth and Fifteenth Amendments to the United States Constitution. *See* Compl. ¶¶ 124-127. Accordingly, those claims must stand regardless of the Court's decision on Defendants' Motion.

## I.      BACKGROUND

On May 18, 2017, Plaintiffs filed the Complaint in this action.[3]  Plaintiffs are a group of Asian-American and Hispanic/Latino residents and voters from the City of Lowell, Massachusetts.  *See* Compl. ¶¶ 15-27.  Defendants include the City of Lowell, the Lowell City Manager, the Lowell City Council, the Lowell School Committee, and the Lowell Election and Census Commission.  *See id.* ¶¶ 28-35.

Currently, all nine members of the Lowell City Council and all six members of the Lowell School Committee are elected biennially in a city-wide at-large plurality voting system.  *See id.* ¶¶ 37-39.  At the polls, Lowell voters are presented with a list of all candidates for both City Council and School Committee, and may vote for up to nine total City Council candidates and six total School Committee candidates.  The top nine and top six vote-getting candidates are elected to the City Council and School Committee, respectively.  *See id.* ¶ 39.

Lowell's use of this entirely at-large plurality election system routinely allows the predominantly white majority voting bloc in Lowell to elect all of its preferred candidates to the City Council and School Committee, and to defeat the preferred candidates of Asian-Americans and Hispanics/Latinos.  *See id.* ¶¶ 63-68.  The inability of Asian-Americans and Hispanics/Latinos to elect candidates of their choice is particularly striking given that they vote cohesively in favor of the same political candidates, and comprise 40% of Lowell's total population, and nearly 33% of its citizen voting age population.  *See id.* ¶¶ 45-46, 62, 64-67.

Despite the significant size of Lowell's Asian-American and Hispanic/Latino population, in the last five elections, only two out of 45 City Council seats were won by Asian-American or Hispanic/Latino candidates, and zero out of 30 School Committee seats.  *See id.* ¶ 50.  In the

---

[3] For the purposes of this Motion, the Court must accept the allegations in the Complaint as true. *See Riggs v. Curran*, 863 F.3d 6, 10 (1st Cir. 2017).

city's entire history, only four Asian-American or Hispanic/Latino candidates have ever been elected to the City Council, and none have been elected to the School Committee. *See id.* ¶ 68. Analyses of the last two municipal elections also show that the predominantly white majority voting bloc in Lowell elected *all* of its top preferred candidates to the City Council and School Committee, handily defeating the top candidates jointly preferred by Asian-Americans and Hispanics/Latinos. *See id.* ¶¶ 64-66. Plaintiffs also document a lengthy history of voting related discrimination against minorities in Lowell, as well as disparities in employment, education, and city benefits and services. *See id.* ¶¶ 90-120.

Plaintiffs bring the present suit alleging violations of Section 2 and the Fourteenth and Fifteenth Amendments to the United States Constitution because it appears to be the only way to rectify the unequal voting opportunities in Lowell. *See id.* ¶¶ 121-127. Elected officials in Lowell have rejected multiple recent efforts to change the City's at-large plurality election system—a system that was adopted in 1957 with the express intent of entrenching "majority" rule and excluding ethnic minorities. *See id.* ¶¶ 73-86. Notably, Lowell is one of the few remaining Massachusetts cities that continue to use an exclusively at-large plurality election system, as most cities now use a combination of district and at-large seats. *See id.* ¶¶ 88-89.

In spite of Plaintiffs' detailed factual allegations concerning the size and cohesiveness of the Asian-American and Hispanic/Latino communities in Lowell, as well as the recent and historical lack of success of minority candidates in Lowell (among other allegations), Defendants contend that Plaintiffs' Section 2 claim should be dismissed because: (1) Plaintiffs have not pleaded sufficient facts to plausibly suggest that Asian-Americans and Hispanics/Latinos are "sufficiently large and geographically compact" to comprise a majority-minority district in the City of Lowell; and (2) the "Voting Rights Act does not provide protection to coalition[]"

minority groups.  Defs.' Mem. in Support of Mot. to Dismiss Pls.' Compl., at 6-13 (ECF No. 18) (hereinafter, "Defs.' Mem."). As explained below, Defendants are wrong on both counts.

## II.     LEGAL STANDARD

When reviewing a motion under Fed. R. Civ. P. 12(b)(6), a district court must accept all factual allegations as true and draw all reasonable inferences in the non-movant's favor. *See Riggs v. Curran*, 863 F.3d 6, 10 (1st Cir. 2017).  A complaint need only contain "enough facts to state a claim to relief that is plausible on its face" in order to survive. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  It need not contain a "heightened fact pleading of specifics." *Id.*

A plaintiff hoping to prevail on the merits of a Section 2 claim must prove that "based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a [protected] class of citizens . . . in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b).

At the pleading stage, however, a plaintiff need only state facts sufficient to *plausibly infer* the three threshold *Gingles* preconditions: (1) that the minority group is sufficiently large and geographically compact to constitute a majority in a single-member district (*i.e.*, "numerousness and compactness" or "geographical compactness"); (2) that the minority group is politically cohesive (*i.e.*, "cohesiveness"); and (3) that the majority votes sufficiently as a bloc to enable it, in the absence of special circumstances, usually to defeat the minority's preferred candidate (*i.e.*, "polarization"). *See Thornburg v. Gingles*, 478 U.S. 30, 50-51 (1986); *Metts v. Murphy*, 363 F.3d 8, 10 (1st Cir. 2004) (en banc) (applying *Gingles* three-part test to motion to

dismiss).  *See also Black Political Task Force v. Galvin*, 300 F. Supp. 2d 291, 299-310 (D. Mass. 2004) (discussing numerousness and compactness and cohesiveness at trial).

The First Circuit has cautioned that an open-ended inquiry of Section 2 claims is warranted in most cases, and that "[i]t is no accident that most cases under [S]ection 2 have been decided on summary judgment or after a verdict, and not on a motion to dismiss." *Metts*, 363 F.3d at 11.  The First Circuit has also held that a remedial statute, such as the Voting Rights Act, "is entitled to a generous construction consistent with its reformative mission." *Hogar Agua y Vida en el Desierto, Inc. v. Suarez-Medina*, 36 F.3d 177, 181 (1st Cir. 1994).

## III.  PLAINTIFFS PLAUSIBLY ALLEGE A DISTRICT SATISFYING THE NUMEROUSNESS AND COMPACTNESS REQUIREMENT

In their Motion, Defendants effectively seek to impose a proof burden on Plaintiffs at the pleading stage, rather than the plausible pleading standard that *Twombly* requires.  According to Defendants, Plaintiffs must "actually define" or "propose" a majority-minority district.  Defs.' Mem. at 7-8.  There is no such requirement to "define" a district at the pleading stage.  Instead, Section 2 plaintiffs must allege facts sufficient to allow a plausible inference that a geographically compact majority-minority district *could* be created, which Plaintiffs have done.

### A.  Plaintiffs Plausibly Allege that an Asian-American and Hispanic/Latino Majority-Minority District Could Be Created in Lowell

The Complaint alleges a specific area of the City where it is possible to draw "at least one" reasonable and properly apportioned majority district jointly comprised of Asian-American and Hispanic/Latino voters—namely, from parts of "the Acre, Lower Highlands, and/or Highlands," which are three contiguous neighborhoods in Lowell (out of eleven total).  Compl. ¶ 61.  The Complaint further alleges that two of these neighborhoods—the Lower Highlands and the Acre—are either "predominantly Cambodian" or have a "high concentration of Asian-Americans and Hispanics/Latinos."  *Id.* ¶¶ 106, 117.  The Complaint also alleges population

statistics from the U.S. Census Bureau showing that Asian-Americans and Hispanics/Latinos together comprise more than 40% of the City's total population and about 33% of its citizen voting age population, far more than would be needed to form one majority-minority district in either a six or nine-district electoral system. *See id.* ¶¶ 45-46. Taken together, it is more than reasonable to infer that there is a sufficiently concentrated Asian-American and Hispanic/Latino population in the Lower Highlands, Highlands, and/or Acre neighborhoods such that a majority-minority district could be created within them for both the nine-member City Council and the six-member School Committee. Accordingly, these factual allegations plausibly support Plaintiffs' claim that the numerousness and compactness requirement is satisfied.

Most courts presented with a challenge to the numerousness and compactness requirement at the pleading stage require no more facts—and often significantly fewer—than Plaintiffs allege here. For example, in *Luna v. County of Kern*, the court found it sufficient for the plaintiffs to merely allege that the Latino population was 34% of the total population in a county with five district seats because it could "reasonably be inferred that a minority group comprising of one-third of the county's total population could comprise majorities in each of at least two . . . districts." No. 16-cv-00568, 2016 WL 4679723, at *4 (E.D. Cal. Sept. 6, 2016). Similarly, in *Hall v. Louisiana*, the court denied a motion to dismiss where plaintiffs alleged only that minority voters comprised 54% of the overall population of the city, but were the majority voting bloc in only two out of five seats. *See* 974 F. Supp. 2d 978, 992 (M.D. La. 2013).[4] The allegations presented in the Complaint here are more than sufficient to raise a "reasonable

___

[4] *See also Comm. for a Fair & Balanced Map v. Ill. Bd. of Elections*, No. 11-cv-05065, 2011 WL 5185567, at *1, 4-6 (N.D. Ill. Nov. 1, 2011) (plaintiffs adequately pleaded that Latinos could comprise a majority-minority in two congressional districts where plaintiffs alleged that the Latino vote was impermissibly packed into one existing district and diluted in two other districts and noting: "[m]ore facts might be alleged, but the [plaintiffs'] complaint states a § 2 claim that rises above implausibility and gives the [defendants] ample notice of the nature of the claim").

expectation that discovery will reveal" a district that meets the numerousness and compactness requirement. *Twombly*, 550 U.S. at 557.

### B. Defendants Seek to Impose an Incorrect Evidentiary Burden by Requiring Plaintiffs to Define a Majority-Minority District at the Pleading Stage

Incongruously, Defendants at once concede that Plaintiffs are not obligated to "produce a delineated map of their proposed district at the pleading stage" (*see* Defs.' Mem. at 8 n. 4), while at the same time contending that Plaintiffs must define the boundaries of their proposed district, or identify a pre-existing majority-minority district, in order to avoid dismissal (*see* Defs.' Mem. at 7-8). But whether Defendants insist on the submission of a map showing a proposed majority-minority district or merely a narrative description of the precise boundaries of such a district, neither is required at the pleading stage. Moreover, as discussed *supra* Part III.A, Plaintiffs have plausibly alleged with reasonable specificity an area where such a district could be formed.

To require Section 2 plaintiffs to define with specificity, or to map, a district where the minority groups are sufficiently numerous and compact to form a majority would be to require them to prove the numerousness and compactness requirement—that is, demonstrate through evidence that such a district can be drawn—at the time a complaint is filed and before discovery and expert discovery. Such an evidentiary requirement is appropriate for a merits determination at summary judgment or trial, but not when examining the sufficiency of a pleading. *See Luna*, 2016 WL 4679723, at *5 ("Forcing plaintiffs to develop an unobjectionable map, before discovery even begins, would be putting the cart before the horse.").[5]

---

[5] Defendants' suggestion (*see* Defs.' Mem. at 8) that Plaintiffs should provide population data for a proposed majority-minority district which they concede does not need to be definitively mapped is both illogical and suffers from the same flaw mentioned in the text—it requires proof similar to what would be required on the merits but at the pleading stage. The allegations here, namely city-wide population statistics and a location of a proposed majority-minority district comprised of parts of three neighborhoods that include high concentrations of Asian-Americans and Hispanics/Latinos, are more than sufficient for pleading purposes, particularly in a city that

At the pleading stage, Plaintiffs are tasked only with alleging sufficient facts to raise a plausible inference that they can satisfy the numerousness and compactness requirement articulated in *Gingles*. To be sure, the *Twombly* standard requires more than merely alleging in conclusory terms that the *Gingles* factors can be met—a hurdle easily cleared by this Complaint—but it does not require a plaintiff to submit a map or define a Section 2-compliant district that might be anticipated at the merits or remedy stages of the case. *See, e.g.*, *Luna*, 2016 WL 4679723, at *5 ("This court is unconvinced that inclusion of [] a hypothetical map would help give the defendant fair notice of what the . . . claim is and the grounds upon which it rests beyond what is already pled.") (quotation omitted)); *Comm. for a Fair & Balanced Map*, 2011 WL 5185567, at *5-6 ("Detailed factual allegations aren't required . . . . To plead a plausible claim, a complaint must contain factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." (quotation omitted)).

Moreover, as the First Circuit has cautioned in *Metts v. Murphy*, which involved a motion to dismiss a Section 2 claim, "[i]t is no accident that most cases under [S]ection 2 have been decided on summary judgment or after a verdict, and not on a motion to dismiss." 363 F.3d 8, 11 (1st Cir. 2004) (en banc) (also concluding that plaintiffs should be given "an opportunity to develop evidence before the merits are resolved").[6]

---

has no pre-existing voting districts. Moreover, the cases cited by Defendants in support of this proposition are cases where plaintiffs *failed to plead* that they could form a majority-minority district. *See supra* p. 11 (discussing *Hall v. Virginia*, 385 F.3d 421 (4th Cir. 2004) and *NAACP v. Snyder*, 879 F. Supp. 2d 662 (E.D. Mich. 2012)).

[6] Even the *Metts* dissenters noted that "in the ordinary course, district courts should allow vote dilution claims to proceed beyond the Rule 12(b)(6) stage." *Id.* at 13 (Selya, J. dissenting).

## C. Defendants' Legal Authority Is Inapposite and Does Not Support Dismissal of Plaintiffs' Complaint

In urging this Court nonetheless to impose a more demanding pleading standard and require Plaintiffs to "define their proposed district" beyond the description otherwise provided in the Complaint, Defendants point to inapposite legal authority describing a plaintiff's *evidentiary* burden at the summary judgment or trial stages of litigation, or to cases where the plaintiffs failed to plead any facts concerning their ability to form a majority-minority district.

For example, Defendants cite *Montes v. City of Yakima*, in which the court determined that plaintiffs had met their compactness and numerousness evidentiary burden *at summary judgment* in part by submitting several maps with majority-minority Latino districts. *See* 40 F. Supp. 3d 1377, 1390-1401 (E.D. Wash. 2014). The decision in no way stands for the proposition that a complaint is subject to dismissal if it does not include a proposed map or define a majority minority district. Similarly, the court in *Rodriguez v. Pataki* evaluated several different Section 2 claims challenging statewide redistricting plans *at summary judgment and trial* in part based on whether the plaintiffs could show that they were a majority-minority in various contested districts. *See* 308 F. Supp. 2d 346, 382-387, 408-410 (S.D.N.Y. 2004).

Defendants' reliance on *Shaw v. Hunt* is especially odd. *See* Defs.' Mem. at 7. At best, *Shaw* stands for the proposition that, *at trial*, a plaintiff must demonstrate that a geographically compact majority-minority district can be drawn—a proposition that Plaintiffs do not dispute. In *Shaw*, a three-judge panel rejected (after a lengthy trial) a racial gerrymandering constitutional challenge (not a Section 2 challenge) brought by *white* voters in response to congressional redistricting. *See* 861 F. Supp. 408, 416-417 (E.D.N.C. 1994), *rev'd* 517 U.S. 899 (1996). In its defense, North Carolina argued that its redistricting plan, which included two majority-minority districts, was constitutional in part because the state had drawn the districts in an effort to

comply with Section 2. *See id.* The panel's majority agreed, holding (again, after a trial) that the redistricting plan was narrowly tailored to satisfy the state's compelling interest in complying with the Voting Rights Act, even though one of the two districts did not incorporate the "geographically compact" minority population that the district was intended to "remedy." *See id.* 416-421, 454-455 n. 50. In the part of the *Shaw* opinion cited by Defendants, the single dissenting judge argued that if the effort to comply with Section 2 served as North Carolina's justification for the district plan, the state should have had to prove *at trial* that the plan in fact complied with Section 2, including the *Gingles* numerousness and compactness requirement. *See id.* at 484-485.[7]

Two other decisions relied upon by Defendants in support of their Motion—*Hall v. Virginia* and *NAACP v. Snyder*—involve plaintiffs who failed entirely to plead that a majority-minority district could be drawn. *See, e.g.*, *Hall v. Virginia*, 385 F.3d 421, 426-427 (4th Cir. 2004) (plaintiffs argued they were not required to plead that they could form a majority in a district); *NAACP v. Snyder*, 879 F. Supp. 2d 662, 669-670 (E.D. Mich. 2012) (plaintiffs alleged that the Hispanic/Latino population could be 42.74% in one district). Such is not the case here, where Plaintiffs do allege that they can create a majority-minority district, and support their allegation with population statistics and identification of a geographically-compact area in which a high concentration of Asian-Americans and Hispanics/Latinos reside.

Similarly, Defendants' reliance on *Broward Citizens for Fair Districts v. Broward County* ("*Broward*") is misplaced. *See* Defs.' Mem. at 8. In *Broward*, the court dismissed a claim by African American plaintiffs that a redistricting plan for the Broward County

---

[7] On review, the United States Supreme Court agreed with the dissenting opinion and overturned the majority opinion, finding that North Carolina's districting plan did not comply with constitutional requirements in part because one of the two majority-minority districts was not geographically compact. *See Shaw*, 517 U.S. at 916.

Commission violated Section 2. *See* No. 12-cv-60317, 2012 WL 1110053, at *5 (S.D. Fla. Apr. 3, 2012).[8] The complaint alleged that plaintiffs had become "sufficiently large and geographically compact" to form a majority in two of nine districts, but the alleged population statistics showed that the African American population in each of the two districts was less than 30%. *See id.* The court concluded it was not reasonable to infer from this data that African Americans could form a majority in a district, and that the remaining allegations amounted to a mere conclusory recitation of the *Gingles* numerousness and compactness requirement. *See id.*

Contrary to Defendants' contention, the *Broward* court's comment in a footnote noting that plaintiffs had failed to present "alternative maps" or "offer *any information* about how they would create majority" districts, *id.* at *5 n. 6 (emphasis added), does not stand for the proposition that a Section 2 plaintiff must "actually propose" a specific majority-minority district in the pleadings. Defs.' Mem. at 8. Rather, it is a recognition that a plaintiff must plead *some information* as to how it could create such a district—which the *Broward* plaintiffs failed to do.[9]

Here, unlike in *Broward*, Plaintiffs' factual allegations are more than conclusory. Citing residential patterns and census data, Plaintiffs have alleged that a majority-minority district for the nine-seat City Council and six-seat School Committee can be created from parts of several neighborhoods in Lowell—the Highlands, Lower Highlands and/or the Acre—with high

---

[8] The *Broward* complaint included allegations regarding both African Americans and Hispanics/Latinos, but plaintiffs clarified in opposing the motion to dismiss that the relevant claim was brought solely on behalf of African American voters. *See* 2012 WL 1110053, at *5.

[9] While a plain reading of the *Broward* footnote does not impose an obligation on a plaintiff to submit a map or to otherwise delineate the boundaries of a majority-minority district, some Section 2 defendants have argued (as Defendants do here) that it does. This argument was explicitly rejected by the *Luna* court, which noted that if the *Broward* footnote was construed to require Section 2-compliant maps in a complaint, it would improperly extend "what is an evidentiary requirement for purposes of summary judgment to the pleading stage of litigation." *Luna*, 2016 WL 4679723, at *5. As noted *supra* pp. 7-8, courts require far less in Section 2 pleadings, and Plaintiffs are not aware of any court that has required a map or a specifically defined district to be included in a complaint to survive a motion to dismiss.

concentrations of Asian-Americans and Hispanics/Latinos, in a City with an overall Asian-American and Hispanic-Latino population of 40%, and a citizen voting age population of 33%. *See* Compl. ¶¶ 37, 46, 61, 106, 117. A plausible inference may be drawn that communities making up 40% of the City's overall population and living in high concentrations in contiguous neighborhoods could create at least one majority-minority district in a multi-district voting system, satisfying the numerousness and compactness pleading requirement. *See, e.g.*, *Luna*, 2016 WL 4679723, at \*4; *Hall*, 974 F. Supp. 2d at 992; *see also Committee for a Fair & Balanced Map*, 2011 WL 5185567, at \*1, 4-6.

## IV. MINORITY COALITION CLAIMS ARE COGNIZABLE UNDER SECTION 2

Defendants contend that the Voting Rights Act does not provide protection to minority citizens asserting their rights in coalitions, such as the Asian-American and Hispanic/Latino coalition identified in the Complaint. *See* Defs.' Mem. at 9-13. Not so. Minority coalition claims have been recognized by the majority of circuit courts that have considered them. Moreover, the First Circuit has implicitly recognized minority coalition claims under Section 2, while also cautioning that Section 2 cases should rarely be dismissed at the pleading stage.

### A. Section 2's Plain Language Supports Minority Coalition Claims

The plain language of Section 2 permits coalition claims brought by citizens as part of a multi-minority class.

Courts in the First Circuit "examine the plain meaning of the statutory language and consider the language in the context of the whole statutory scheme." *Gen. Motors Corp. v. Darling's*, 444 F.3d 98, 108 (1st Cir. 2008) (quotation and alterations omitted). Where a remedial statute uses broad generalized language, it should be interpreted "generously so as to effectuate the important congressional goals." *Cia. Petrolera Caribe, Inc. v. Arco Caribbean, Inc.*, 754 F.2d 404, 428 (1st Cir. 1985).

The plain language of Section 2 allows minority coalition claims. Subsection (a) of Section 2 broadly forbids voting practices or procedures that "result[] in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). A violation is established upon a showing that an election process is "not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b). By its terms, Section 2 encompasses all claims brought on behalf of "*any citizen*" whose right to vote is denied "*on account of race or color*" by a particular voting practice or procedure. 52 U.S.C. § 10301(a) (emphasis added). Nothing in this language restricts relief only to a "class of citizens" comprised of a single "race or color."

Defendants incorrectly contend that the statute's use of the singular indefinite article ("a class of citizens") operates to prohibit coalition groups. *See* Defs.' Mem. at 10. Under Defendants' logic, "a class of citizens" can mean only a group of citizens of a single race or color. But this reading is contrary to the language of the statute affording protection to "any citizen" who, "on account of race or color," has had their right to vote denied or abridged by a voting practice or procedure. 52 U.S.C. § 10301(a). Membership in the protected "class of citizens" is thus defined not by any single minority group or race, but rather by a group of citizens that has had their right to vote denied "on account of race or color," such that the class "members have less opportunity than other[s] . . . to elect representatives of their choice." 52 U.S.C. § 10301(a)-(b). This is the *sine qua non*—the class of citizens must all have had their right to vote denied or abridged by the same process or practice or procedure. Nothing in the

language of Section 2 adds the further limitation that Defendants urge on this Court—that only members of a single "race or color" may comprise a relevant "class of citizens."

Defendants' interpretation of Section 2 runs squarely counter to the First Circuit's directive that remedial statutes with broad language—such as Section 2—be interpreted generously to accomplish their goals. Congress enacted Section 2 to remedy discriminatory voting practices that denied citizens their right to vote by virtue of their race or color. *See Shelby Cty., Ala. v. Holder*, 133 S. Ct. 2612, 2619 (2013); *see also* 52 U.S.C. § 10301. Any number of potential voting practices—such as a "Whites only" requirement, or a poll tax, or a photo identification requirement—may discriminate simultaneously against multiple minority groups, and nonetheless are remediable under Section 2. *See, e.g.*, *Veasey v. Abbott*, 830 F.3d 216, 264-265 (5th Cir. 2016) (en banc). Defendants' proposed reading of Section 2 would disallow citizens of different colors or races from joining as a "class of citizens" to challenge such practices. Such a reading would effectively negate the ability of those citizens to obtain relief for a voting practice that discriminates against multiple minority groups and potentially leave such a practice unaddressed in whole or in part—a result Congress cannot have intended.[10]

---

[10] Section 2's clear language does not require the Court to look to the statute's legislative history for additional guidance. *See Gen. Motors Corp.*, 444 F.3d at 108 (only when a statute is ambiguous should a court "look behind the plain language to the legislative history"). Nevertheless, the Voting Rights Act's legislative history indicates that Congress was cognizant of and indeed envisioned the potential for Section 2 claims to be brought by minority coalitions. In its 1975 reauthorization of the Act, Congress specifically pointed to discrimination faced by both Mexican American and African American voters in Texas as a type of discrimination that the Act was intended to remedy. *See* S. Rep. No. 94-295, at 25-28 (1975), *reprinted in* 1975 U.S.C.C.A.N. 774, 791-794. When Congress amended the Act in 1982 to make clear that discriminatory intent was not required to find a violation, it cited *Wright v. Rockefeller*, 376 U.S. 52, 56-57 (1964), in which African American and Puerto Rican voters together challenged redistricting by the New York legislature. *See* S. Rep. No. 97-417, at 132 (1982), *reprinted in* 1982 U.S.C.C.A.N. 177, 304. Congress was thus aware that combined minority groups could be considered to constitute a plaintiff class under the Voting Rights Act; it did nothing to proscribe them. Congress was also presumably aware of Supreme Court jurisprudence allowing coalition

## B. The Majority of Circuit Courts that Have Addressed the Issue Permit Section 2 Minority Coalition Claims

The majority of circuit courts to consider Section 2 minority coalition claims (the Second, Fifth, Ninth, and Eleventh Circuits) explicitly or tacitly recognize them as cognizable.[11]

In 1987, the Fifth Circuit became the first circuit court to recognize that minority groups could be aggregated for purposes of Section 2. *See LULAC v. Midland Indep. Sch. Dist.*, 812 F.2d 1494, 1500 (5th Cir.), *vacated on state law grounds*, 829 F.2d 546 (5th Cir. 1987) (approving of the manner in which African Americans and Hispanics were joined together as a compact minority group "capable of carrying a district"). The Fifth Circuit again reached the same result one year later in *Campos v. City of Baytown, Tex.*, 840 F.2d 1240 (5th Cir. 1988). Analyzing the text of Section 2, the *Campos* court concluded that:

> There is nothing in the law that prevents the plaintiffs from identifying the protected aggrieved minority to include both Blacks and Hispanics. [Section 2] protects the right to vote of both racial and language minorities. . . . If, together, they are of such numbers residing geographically so as to constitute a majority in a single

---

claims in other, similar contexts where multi-minority groups shared cohesive interests and suffered from common discrimination. *See, e.g.*, *Keyes v. Sch. Dist. No. 1*, 413 U.S. 189, 197-198 (1973) (Equal Protection case concluding that African American and Hispanic population could be combined to determine whether a school was "segregated").

Courts continue to recognize in a variety of contexts that multiple minority groups may jointly bring an action under federal anti-discrimination laws where the groups suffer from the same discriminatory practice. *See, e.g.*, *Bank of Am. Corp. v. City of Miami, Fla.*, 137 S. Ct. 1296, 1300-1301 (2017) (Fair Housing Act claim based on disparate impact on African Americans and Latinos); *Langlois v. Abington Hous. Auth.*, 207 F.3d 43, 46 (1st Cir. 2000) (same); *Veasey*, 830 F.3d at 227 (claim under Fourteenth and Fifteenth Amendments and Voting Rights Act based on discrimination against African Americans and Latinos).

[11] The Supreme Court has yet to decide whether Section 2 permits coalition claims, but has assumed without deciding that such claims are cognizable. *See Growe v. Emison*, 507 U.S. 25, 41 (1993) ("Assuming (without deciding) that it was permissible for the District Court to combine distinct ethnic and language minority groups for purposes of assessing compliance with § 2, when dilution of the power of such an agglomerated political bloc is the basis for an alleged violation, proof of minority political cohesion is all the more essential.") (citing, among other cases, *Badillo v. City of Stockton, Cal.*, 956 F.2d 884, 891 (9th Cir. 1992)).

member district, they cross the *Gingles* threshold as potentially disadvantaged voters.

*Id.* at 1244 (citations omitted). The court further noted that to prove vote dilution under *Gingles*, a minority coalition must also show that the minorities "actually vote together and are impeded in their ability to elect their own candidates by all of the circumstances, including especially the bloc voting of a white majority that usually defeats the candidate of the minority." *Id.*[12]

The Eleventh Circuit adopted the Fifth Circuit's view on coalition districts in *Concerned Citizens of Hardee County v. Hardee County Board of Commissioners*, stating that "[t]wo minority groups (in this case blacks and hispanics) may be a single section 2 minority if they can establish that they behave in a politically cohesive manner." 906 F.2d 524, 526 (11th Cir. 1990).[13] Coalition districts were likewise recognized by the Ninth Circuit in *Badillo v. City of Stockton, California*. *See* 956 F.2d 884, 886 (9th Cir. 1992) (assuming that a combined group of African American and Hispanic voters met the first *Gingles* precondition).[14] And in *Bridgeport Coalition for Fair Representation v. City of Bridgeport*, the Second Circuit also assumed that coalition districts are covered under Section 2. *See* 26 F.3d 271, 275-276 (2d Cir. 1994), *vacated on other grounds*, 512 U.S. 1283 (1994). The Second Circuit agreed with the district court that the first *Gingles* precondition had been met, and found "both testimonial and statistical evidence that African Americans and Hispanics in Bridgeport [were] politically cohesive and that voting

---

[12] *See also LULAC v. Clements*, 999 F.2d 831, 864 (5th Cir. 1993) ("if blacks and Hispanics vote cohesively, they are legally a single minority group"); *Overton v. Austin*, 871 F.2d 529, 536 (5th Cir. 1989); *Brewer v. Ham*, 876 F.2d 448, 453 (5th Cir. 1989); *Perez v. Abbott*, No. 11-cv-00360, 2017 WL 1450121, at *5-8 (W.D. Tex. Apr. 20, 2017).

[13] *See also Georgia State Conf. of NAACP v. Gwinnett Cty. Bd. of Registrations & Elections*, No. 16-cv-02852, 2017 WL 4250535, at *2 (N.D. Ga. May 12, 2017) ("the Court rejects Defendants' argument that, as a matter of law, Section 2 claims may not be brought by a coalition of multiple minorities"); *Johnson v. Hamrick*, 155 F. Supp. 2d 1355, 1368 (N.D. Ga. 2001), *aff'd*, 296 F.3d 1065 (11th Cir. 2002) (minority groups "may be combined to form a single-majority district").

[14] *See also Romero v. City of Pomona*, 883 F.2d 1418, 1426 (9th Cir. 1989), *abrogated on other grounds by Townsend v. Holman Consulting Corp.*, 914 F.2d 1136 (9th Cir. 1990) (en banc).

in the City [was] remarkably racially polarized." *Id.* at 276.[15]  Only the Sixth Circuit, in a divided opinion, has concluded that coalition claims are not viable under Section 2.  *See Nixon v. Kent Cty.*, 76 F.3d 1381, 1386-1393 (6th Cir. 1996) (en banc).  Accordingly, the weight of authority is heavily in favor of minority coalition claims.[16]

### C.  Decisions in the First Circuit Suggest that Section 2 Minority Coalition Claims Are Cognizable

The First Circuit has not explicitly ruled on the issue of minority coalition claims.  However, in a pre-*Gingles* case—*Latino Political Action Committee, Inc. v. City of Boston*, 784 F.2d 409 (1st Cir. 1986) ("*LPAC*")—the First Circuit confronted minority coalition claims under Section 2 and did not suggest that such claims were not allowed.  Defendants' description of the *LPAC* decision, and their attempt to draw a contrary conclusion from it, are misplaced.  *See* Defs.' Mem. at 12.

---

[15] *See also Pope v. Cty. of Albany*, No. 11-cv-00736, 2014 WL 316703, at *5-6 (N.D.N.Y. Jan. 28, 2014) (rejecting "[d]efendants['] conten[tion] that black and Hispanic voters may not form a coalition"); *Rodriguez v. Pataki*, 308 F. Supp. 2d 346, 405 (S.D.N.Y. 2004) (following the "Second Circuit in assuming that blacks and Hispanics can be combined in a section 2 claim").

[16] Defendants' reliance on *Hall v. Virginia*, 385 F.3d 421 (4th Cir. 2004) falls wide of the mark, as that case did not address the type of Section 2 coalition claims at issue here.  In *Hall*, the plaintiffs were African American voters who alleged that, although not a numerical majority, they were sufficiently numerous in one district to elect their preferred candidates when combined with "crossover" white voters.  *Id.* at 423, 425, 425 n. 6.  The issue decided in *Hall* was whether so-called "crossover" district claims—relying on minority voters combined with some majority-member voters—were cognizable.  *See id.*; *see also id.* at 430-431 (using the word "coalition" to describe white and African American voters who might vote together politically).  That case did not address whether Section 2 allowed *minority coalition* claims like those presented here.

Notably, the Supreme Court has concluded that "crossover" districts are not cognizable under Section 2.  *See generally Bartlett v. Strickland*, 556 U.S. 1 (2009) (plurality opinion).  In *Bartlett v. Strickland*, the Supreme Court cited the need not to confuse "crossover" district analysis with the separate issue of minority coalition district claims, and explained that it had yet to decide the latter issue.  *See id.* at 13-14 ("This Court has referred sometimes to crossover districts as 'coalitional' districts . . . .  But that term risks confusion with coalition-district claims in which two minority groups form a coalition to elect the candidate of the coalition's choice. We do not address that type of coalition district here." (citations omitted)).  *See also supra* note 11.

In *LPAC*, a group of plaintiffs representing African American, Hispanic and Asian-American voters sued the City of Boston under Section 2 of the Voting Rights Act, alleging that minority voting power was unlawfully diluted by the City's districting plan for the Boston City Council and the Boston School Committee. *See* 784 F.2d at 410. Plaintiffs made three specific claims about the districting plan, including that the plan impermissibly "packed" the minorities into two districts. *See id.* at 413-415. The First Circuit analyzed the "packing" claim by examining both the African American population alone, as well as the *combined* American, Hispanic, and Asian-American population. *See id.* at 413-414 (considering the six percentage point rise in "packing" statistics when Hispanics and Asian-Americans were added). The Court rejected the plaintiffs' "packing" claim, in part because of a lack of evidence of cohesion and polarization (*i.e.*, requirements later enunciated in *Gingles*), "particularly if Blacks, Hispanics and Asians are treated as a single group." *Id.* at 414.[17] In this way, the First Circuit's decision implicitly recognized that coalition claims are permissible and examined whether the plaintiffs had adequately pleaded such a claim. Defendants' treatment of *LPAC* focuses narrowly on the decision's discussion of the African American population and simply ignores the balance of the court's analysis. *See* Defs.' Mem. at 12-13.

A three-judge panel in the District of Massachusetts has also implicitly recognized that coalition claims are viable, if plaintiffs properly plead and adduce evidence to prove them. In *Black Political Task Force v. Galvin*, a coalition of African American and Hispanic voters sued the Massachusetts legislature and the Secretary of the Commonwealth alleging that the redistricting of state legislative seats in the City of Boston violated Section 2. *See* 300 F. Supp.

---

[17] In *LPAC*, the other two claims were that the plan "fragmented" the Hispanic vote across five districts, and that it diluted the Asian-American vote by "submerging" it in a predominantly white district. 784 F.2d at 413, 415. The Court analyzed these claims as individual minority groups because that was how plaintiffs presented the claims. *See id.*

2d 291, 294 (D. Mass. 2004). Judge Selya, sitting by designation and writing for the panel, noted that the Court need not "probe the complex question of whether the plaintiffs' evidence revealed a cohesive coalition among African-American and Hispanic voters" because "[a]t trial, the testimony concentrated [only] on the voting patterns of African-Americans." *Id.* at 294 n. 1.

Moreover, as noted *supra* p. 9 and note 6, the First Circuit in *Metts v. Murphy* recommended a flexible approach both to pleading and deciding Section 2 claims, and cautioned against dismissing Section 2 claims on a motion to dismiss. *See* 363 F.3d 8, 11 (1st Cir. 2004) (en banc). In *Metts*, the court also separately noted that *Gingles* was especially concerned with "multi-member districts"—like the city-wide at-large election system used in Lowell—"which have an obvious potential to submerge the electoral power of even a substantial and cohesive minority [voting] bloc" because combining seats "into one multi-member district can easily eliminate the minority's ability to elect one of their own to any of the seats." *Id.* at 10.

For all these reasons, this Court should find that minority coalition claims are cognizable under Section 2 and allow Plaintiffs' claim to proceed.[18]

## V. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully submit that Defendants' Motion should be DENIED. In the alternative, Plaintiffs respectfully request leave to amend their Complaint.

---

[18] As noted *supra* note 1, Defendants do not contend that Plaintiffs failed to adequately allege the cohesiveness of Asian-Americans and Hispanics/Latinos in Lowell, or that polarized voting by Lowell's predominantly white majority voting bloc routinely defeats their preferred candidates—salient factors noted by courts in evaluating minority coalition claims. *See, e.g.*, *Bridgeport Coal. for Fair Representation*, 26 F.3d at 276 (noting evidence that African Americans and Hispanics voted cohesively and that voting patterns were "remarkably racially polarized"). As set forth *supra* pp. 3-4 and Part III, Plaintiffs allege these *Gingles* preconditions—and the numerousness and compactness precondition—in detail.

Dated: September 29, 2017

Respectfully submitted,

CHANMONY HUOT, VLADIMIR SALDAÑA,
CHAMPA PANG, LIANNA KUSHI, THOEUN
KONG, DENISSE COLLAZO, SUE J. KIM,
SOADY OUCH, TOOCH VAN, CARMEN
BERMUDEZ, KEI KAWASHIMA-GINSBERG,
DANIEL K. UK, and FAHMINA ZAMAN,

By their attorneys:

_____

Robert G. Jones (BBO # 630767)
Scott Taylor (BBO # 692689)
Matthew Mazzotta (BBO # 679230)
Daniel E. Fine (BBO # 691980)
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199-3600
Telephone: (617) 951-7000
Fax: (617) 951-7050
Robert.Jones@ropesgray.com
Scott.Taylor@ropesgray.com
Matthew.Mazzotta@ropesgray.com
Daniel.Fine@ropesgray.com

Shane D. Anderson (Of Counsel)
ROPES & GRAY LLP
1900 University Ave, 6th Floor
East Palo Alto, CA 94303
Telephone: (650) 617-4000
Fax: (650) 617-4090
Shane.Anderson@ropesgray.com

Oren M. Sellstrom (BBO # 569045)
Iván Espinoza-Madrigal (Of Counsel)
LAWYERS' COMMITTEE FOR CIVIL RIGHTS
    AND ECONOMIC JUSTICE
61 Batterymarch Street, Fifth Floor
Boston, MA 02110
Telephone: (617) 988-0608
Fax: (617) 482-4392
osellstrom@lawyerscom.org
iespinoza@lawyerscom.org

## CERTIFICATE OF SERVICE

I hereby certify that on September 29, 2017, I filed a copy of this document through the Electronic Case Filing System for filing and electronic service to the registered participants as identified on the Notice of Electronic Filing.

/s/ Robert G. Jones